# IN THE COURT OF APPEALS OF IOWA

No. 15-1288
Filed March 8, 2017

**DONTE MARCELL GILMORE,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

    Appeal from the Iowa District Court for Polk County, Richard G. Blane II,

Judge.


    Donte Gilmore appeals the dismissal of his application for postconviction

relief. **AFFIRMED.**



    John Audlehelm of Audlehelm Law Office, Des Moines, for appellant.

    Thomas J. Miller, Attorney General, and Genevieve Reinkoster, Assistant

Attorney General, for appellee State.



    Considered by Bower, P.J., McDonald, J., and Mahan, S.J.*  Blane, S.J.*

takes no part.

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**MAHAN, Senior Judge.**

Donte Gilmore appeals the dismissal of his application for postconviction relief (PCR). He contends the PCR court erred in rejecting his ineffective assistance of counsel claims.

> "Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law." *Perez v. State*, 816 N.W.2d 354, 356 (Iowa 2012) (quoting *Goosman v. State*, 764 N.W.2d 539, 541 (Iowa 2009)). However, "[u]nder both the State and Federal Constitutions, ineffective-assistance-of-counsel claims are reviewed de novo." *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). We review these claims de novo because they are based on the constitutional guarantees of the effective assistance of counsel found in the Sixth Amendment of the U.S. Constitution and article I, section 10 of the Iowa Constitution. *See State v. McNeal*, 867 N.W.2d 91, 99 & n.1 (Iowa 2015).

*Nguyen v. State*, 878 N.W.2d 744, 750 (Iowa 2016).

In order to prevail on his ineffective-assistance-of-counsel claims, the applicant must prove by a preponderance of the evidence both that (1) trial counsel breached an essential duty and (2) prejudice resulted from that breach. *See id.* In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the United States Supreme Court explained a successful ineffectiveness claim will establish that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment and "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Upon our de novo review, we conclude Gilmore was not deprived of a fair trial by the alleged errors of counsel.

Gilmore shot and killed his wife—this is not in dispute. A jury rejected his insanity and diminished-responsibility defenses and convicted him of first-degree

murder. *State v. Gilmore*, No. 11-0858, 2012 WL 3589810, at *1 (Iowa Ct. App. Aug. 22, 2012). On appeal from his conviction, this court rejected Donte's allegation that his trial counsel were ineffective for failing to object to the jury instructions relating to his insanity defense. *See id.* at *6-9.

In his PCR action, Gilmore alleged his two trial counsel, Philip Reser and Wendy Samuelson, were ineffective in failing to move for a mistrial after receiving notes from the jury, failing to object to the prosecutor's questions to a jailhouse witness's testimony concerning religious beliefs, failing to object to the introduction of photographs of assault rifles, failing to convince him to accept a plea agreement (requiring him to plead guilty "to second degree murder and attempted murder and run those two consecutive"), and failing to demonstrate police had moved a hammer at the crime scene.

After a hearing and reopening the record for additional claims and evidence to be submitted, the PCR court carefully addressed each of Gilmore's claims and dismissed the application. Upon our de novo review of Gilmore's claims and the record, we agree with the district court Gilmore has failed to establish his trial counsel's performances were so deficient he was deprived of a fair trial.

*1. Jury notes.*[1] The two notes from the jury indicated the jury was focusing on Gilmore's asserted defense. We cannot conclude the trial court's responses to the jury notes were improper, and thus, Gilmore has failed to establish trial counsel should have objected. Trial counsel testified their responses to the jury notes were strategic. We decline to second guess a reasonable tactical decision.

---

[1] The issues found at headnotes 1, 3, 4, and 5 are argued in Gilmore's pro se brief.

*See State v. Martin*, 587 N.W.2d 606, 609 (Iowa Ct. App. 1998) ("The court will generally presume counsel is competent, and we will not second guess a reasonable trial strategy."); *e.g.*, *Houston v. State*, No. 05-1591, 2007 WL 254543, at *7 (Iowa Ct. App. Jan. 31, 2007) ("In response to each note, defense counsel requested that no further instruction be given, and that the jury be directed to consider the instructions and continue its deliberations. Mayer and Goudy [trial counsel] both testified that this was a strategic decision by counsel. Mayer clarified he did not want the judge to expand on the instruction because it appeared the jury was having trouble reaching a decision which, in his experience, was to Houston's advantage.").

*2. Jailhouse witness's testimony concerning religious beliefs.* Gilmore contends Elijah Campbell, a fellow jailhouse resident with whom Gilmore engaged in conversations,[2] was asked improper questions about religion to which his trial attorneys should have objected.

The PCR court's observations are an accurate characterization of the record:

---

[2] Campbell testified without objection that he first started to converse with Gilmore in the jail because they both were reading the Bible. They then discussed religion, leading to Gilmore talking about Gilmore shooting his wife. Gilmore talked about his arguments with his wife over her not following his religious beliefs. Gilmore told Campbell when he shot his wife she fell to the left, which indicated to Gilmore she had turned her back on God, and that this justified him shooting her.

Campbell testified he went to the prosecutor with this conversation because he disagreed with Gilmore.

On redirect, the State asked:

Q. And your difference between your view of God and his had to be—is over what? A. My view is, I don't believe that God thinks it's okay to kill your wife. And he said—he basically said, "She's in hell, and I'm here serving him now, so this is what—this is what was meant to be." I don't believe that. I don't believe nobody deserves to die. I don't believe God—my God don't tell me that anybody deserves to die.

[D]efense counsel did not object to Campbell's testimony about his discussions with Gilmore or any reference to religion. Gilmore does not specify a particular question involving religion that he believes was objectionable, even though he indicates that his trial attorneys at deposition [stated] that "the particular question Gilmore complained of was objectionable." Although not specified in Gilmore's pleadings, his attorney did ask the trial attorneys (Samuelson and Reser) during their depositions, if it would be objectionable if witness Campbell was asked whether his God condoned murder, would each consider that to be relevant evidence. Both Samuelson and Reser thought that would not be relevant.

The prosecutor did ask Campbell, "Does the God you worship allow this to happen?" Campbell answered, "No, sir." We agree with the PCR court that the question

followed questions about why Campbell came forward and advised authorities of Gilmore's conversations with Campbell. This involved Campbell's disagreement with Gilmore over religion and that Gilmore's perception of his wife "turning her back on God" did not in Campbell's religious beliefs justify shooting one's wife. In the overall context of Campbell's testimony, the question was not objectionable. The fact that Gilmore's trial counsel did not object did not constitute ineffective assistance of counsel.

On appeal, Gilmore contends the PCR court misunderstood his complaint. Relying on *Dedric v. Hopson*, 17 N.W. 772, 773 (Iowa 1883),[3] Gilmore faults his lawyers for failing to respond to this claimed improper injection of religion into his case, arguing: "[W]hen a prosecutor asks his own witness to comment on his own good, or preferable, religious views, the questioning descends into improper

---

[3] We are not convinced *Dedric* stands for the proposition argued. "[A] witness cannot be required to testify to his want of belief in any religious tenet, nor to divulge his opinions upon matters of religious faith." *Dedric*, 17 N.W. at 773. *Dedric* is later cited by the supreme court for the proposition that it is improper to discredit a witness by inquiring about the oath taken before testifying. *State v. Browning*, 133 N.W. 330, 333 (Iowa 1911) ("If one understands the nature of an oath and assumes to take it as binding upon him, he is a competent witness.").

witness bolstering and vouching." He also asserts the questions were "argumentative and did not elucidate the State's position on the issues on trial."

Both of Gilmore's trial attorneys testified they did not remember the question being asked. Reser testified "[t]hat would probably be something that we would object to as being irrelevant." Defense counsel also testified, however, that Gilmore's unorthodox religious beliefs were relevant to his state of mind and his defense.[4] We are not persuaded that the prosecutor's questions "amounted to the prosecutor unfairly disparaging the defendant in an effort to inflame the passions of the jury" or that defense counsel's failure to object was constitutionally deficient representation.

*3. Video of crime scene included assault rifles.* The trial record indicates Gilmore's attorneys *did* object to photographs of assault rifles found at Gilmore's home that were not used in the killing of his wife, as well as to a crime scene video that also showed the assault rifles. The trial court excluded the photographs but allowed the video. Gilmore's defense at trial was that at the time he shot his wife, he had a dissociative event that left him unable to form the requisite intent or to know right from wrong. Numerous exhibits related to the murder weapon, including the semi-automatic .45 caliber used to kill Gilmore's wife, were admitted into evidence. There was testimony that no ammunition other than for that for the .45 was found outside the cabinet or closet where those

---

[4] We observe a person's beliefs, superstitions, or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution. *United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir. 1996) ("The First Amendment's protection of beliefs and associations does not preclude such evidence where relevant to a trial issue.").

assault rifles were found. There was no inference that the other weapons in the house had any relation to the shooting. We are unable to conclude the crime scene video affected the results of the trial.

*4. Plea offer.* Gilmore asserts he would have been willing to enter a guilty plea to second-degree murder and attempted murder with consecutive sentences as offered by the State had he known that double jeopardy would have voided one of the sentences. The underlying premise of this allegation is faulty—in the circumstances presented here, a court could find a factual basis for both attempted murder and second-degree murder. *See State v. Velez*, 829 N.W.2d 572, 584 (Iowa 2013) ("It is well established in Iowa law that a single course of conduct can give rise to multiple charges and convictions."); *see also State* v. *Kehoe*, 804 N.W.2d 302, 313 (Iowa Ct. App. 2011) (stating malice aforethought— which is an element of second-degree murder—is not an element of the crime of attempt to commit murder).

> We adopt the PCR court's findings:
>
> Here, the facts would support both verdicts. The evidence showed Gilmore fired numerous bullets at the victim. Seven struck the victim; four would have caused a fatal wound. The firing of one of the non-fatal shots would have supported the attempted murder charge, while any one of the four fatal shots would have supported the second-degree murder plea. [Defense counsel] Samuelson also believed that there was adequate evidence for a factual basis for a guilty plea to both second degree murder and attempted murder.

Because Gilmore's premise is erroneous, this claim fails.

*5. Location of the hammer.* Gilmore asserted his wife had threatened him with a hammer before he shot her. He complains trial counsel did not properly investigate whether the police had moved the hammer, i.e., tampered with the

evidence. In the crime scene video shown to the jury, the hammer can be seen on the porch of the house with a clipboard on it. Defense counsel Samuelson testified many people, including Gilmore's family and the paramedics, had entered the crime scene prior to the arrival of the crime scene investigation unit.

Gilmore argues that had counsel developed this notion that police moved the hammer, it "would have corroborated the statements Gilmore made initially to police and during the interview at the police department that [his wife] threatened him with a hammer which provoked the dissociative episode he experienced." Yet, trial counsel did present this information to the jury in relation to Gilmore's asserted defense.[5] Defense counsel introduced the hammer into evidence and argued the hammer at the scene supported Gilmore's statements. The jury rejected Gilmore's insanity defense, and we are not persuaded the location of the hammer would have changed the result.

Because Gilmore has failed to prove trial counsel were ineffective, we affirm the dismissal of his PCR application.

**AFFIRMED.**

---

[5] At the criminal trial, attorney Samuelson in closing argument stated:
> [T]hat mental health evidence also supports the argument that Donte Gilmore faced a serious provocation, a threat with a hammer—and, yes, the hammer was found on the porch. But let's talk about the fact that there were at least two people that left that house prior to law enforcement getting there: Donte himself and his mom.
> We don't really know where the hammer was dropped because the people who were involved here can't tell us, for one reason or another. We do know Donte tells us that [the wife] doesn't have a hammer at the time the shooting starts. But that provocation with the hammer is part and parcel of what led to the snap, what led to his emotional circuits just blowing, what led to him being overwhelmed with an irresistible passion and pulling the trigger.